**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

WHITMAN-WALKER CLINIC, Inc., *et al.*,

          *Plaintiffs*,

      v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, *et al.*,

          *Defendants*.

**Case No. 1:20-cv-01630 (JEB)**

---

**BRIEF OF AMICI CURIAE AARP, AARP FOUNDATION, AND SAGE IN SUPPORT
OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR, IN THE
ALTERNATIVE, A STAY PENDING JUDICIAL REVIEW PURSUANT TO
5 U.S.C. § 705**

Kelly Bagby (D.C. Bar # 462390)*
Meryl Grenadier (D.C. Bar # 1024111)
Maame Gyamfi (D.C. Bar # 462842)
AARP Foundation
601 E St., NW
Washington, D.C. 20049
Telephone: (202) 434-2137
kbagby@aarp.org
mgrenadier@aarp.org
mgyamfi@aarp.org
*Counsel of Record*

July 15, 2020

          *Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to LOCAL CIV. R. 7(o)(5), amici submit the following corporate disclosure statements:

### AARP and AARP Foundation

The Internal Revenue Service has determined that AARP is organized and operated exclusively for the promotion of social welfare pursuant to Section 501(c)(4) of the Internal Revenue Code and is exempt from income tax. The Internal Revenue Service has determined that AARP Foundation is organized and operated exclusively for charitable purposes pursuant to Section 501(c)(3) of the Internal Revenue Code and is exempt from income tax. AARP and AARP Foundation are also organized and operated as nonprofit corporations under the District of Columbia Nonprofit Corporation Act.

Other legal entities related to AARP and AARP Foundation include AARP Services, Inc., and Legal Counsel for the Elderly. Neither AARP nor AARP Foundation has a parent corporation, nor has either issued shares or securities.

### SAGE

SAGE does not have a parent corporation, and no corporation owns 10% or more of its stock.

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES ............................................................. iii

STATEMENT OF INTEREST ........................................................... 1

SUMMARY OF THE ARGUMENT ..................................................... 2

ARGUMENT ..................................................................................... 4

I. The Revised Rule Will Irreparably Harm LGBTQ Older Adults By Deepening the Pervasive Discrimination They Face In Accessing Quality Health Care ......................................................... 4

 A. Sex Discrimination In Health Care Has A Disproportionate Impact On LGBTQ Older Adults ....................................... 4

 B. Discrimination Against LGBTQ Older Adults Is Compounded By Other Systemic Disadvantages .................................... 8

 C. LGBTQ Older Adults Face Intersectional Discrimination .............. 10

 D. LGBTQ Older Adults Also Face Irreparable Harm If The Revised Rule's "Conforming Amendments" Are Implemented .................... 12

II. The Revised Rule Harms Older Adults With Limited English Proficiency By Rolling Back Language Access Protections and Blunting Their Access To Care ......................................................... 14

 A. Without Adequate Antidiscrimination Protections, Millions of Older Adults With LEP Will Not Have Meaningful Access To Health Care .......................................................... 15

 B. The Revised Rule Undermines Section 1557's Protections For Older Adults With LEP And Threatens Their Ability To Meaningfully Access Care During The Pandemic ................................ 18

III. Enjoining Implementation of the Revised Rule Is In The Public Interest Because An Injunction Will Stop Millions of Older Adults From Losing Life-Saving Antidiscrimination Health Care Protections In the Midst Of The Pandemic .................................................. 21

CONCLUSION ................................................................................. 23

# TABLE OF AUTHORITIES

## CASES

*Bostock v. Clayton Cty.*,
    140 S. Ct. 1731 (2020) ................................................................................. 3

*Brantley v. Maxwell-Jolly*,
    656 F. Supp. 2d 1161 (N.D. Cal. 2009) ...................................................... 13

*District of Columbia v. U.S. Dep't of Agric.*,
    No. 20-cv-119, 2020 WL 1236657 (D.D.C. Mar. 13, 2020) ......................... 21

*Lau v. Nichols*,
    414 U.S. 563 (1974) .................................................................................. 14

*Trump v. Int'l Refugee Assistance Project*,
    137 S.Ct. 2080 (2017) ............................................................................... 21

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................... 21

## STATUTES

42 U.S.C. § 18116 (2010) ................................................................................. passim

## REGULATIONS

Nondiscrimination in Health Programs and Activities,
    81 Fed. Reg. 31,376 (May 18, 2016) (formerly codified at 45 C.F.R. pt. 92) .......... passim

Nondiscrimination in Health and Health Education Programs or
    Activities, Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020)
    (to be codified at 42 C.F.R. pts. 438, 440, 460;
    45 C.F.R. pts. 86, 92, 147, 155, 156) ........................................................ passim

**OTHER AUTHORITIES**

Angela Houghton, AARP Research,
  *Maintaining Dignity: Understanding and Responding to the Challenges
  Facing Older LGBT Americans: An AARP Survey of LGBT Adults Age 45-plus,*
  (March 2018), https://www.aarp.org/content/dam/aarp/research/
  surveys_statistics/life-leisure/2018/maintaining-dignity-
  lgbt.doi.10.26419%252Fres.00217.001.pdf ......................................................... 5, 7, 9, 11

Anna Gorman,
  *LGBTQ Seniors Face Discrimination in Long-Term Care*,
  Kaiser Health News (Oct. 18, 2016),
  https://www.pbs.org/newshour/nation/lgbtq-seniors-face-
  discrimination-long-term-care. ........................................................................... 7

Ariel Yeheskel et al.,
  *Exploring the 'Patient Experience' of Individuals with Limited
  English Proficiency: A Scoping Review,*
  21 J. of Immigrant & Minority Health 853 (Sept. 10, 2018) ........................................... 15

Asian Health Services, Comment Letter on Proposed Rule on Nondiscrimination
  in Health and Health Education Programs or Activities (Aug. 13, 2019),
  https://www.regulations.gov/document?D=HHS-OCR-2019-0007-146378 .............. 17, 20

California Pan-Ethic Health Network, Comment Letter on Proposed Rule on
  Nondiscrimination in Health and Health Education Programs or Activities
  (Aug. 13, 2019),
  https://www.regulations.gov/document?D=HHS-OCR-2019-0007-152828 ................... 17

Center for Medicare Advocacy,
  *Quick Medicare Facts & Statistics*, (Feb. 9, 2011),
  https://medicareadvocacy.org/quick-medicare-facts-statistics/ ........................................ 15

City of New York, Comment Letter on Proposed Rule on Nondiscrimination in
  Health and Health Education Programs or Activities (Aug. 13, 2019),
  https://www.regulations.gov/document?D=HHS-OCR-2019-0007-150529 .............. 16, 17

CMS Office of Minority Health,
  *Understanding Communication and Language Needs
  of Medicare Beneficiaries*, (Apr. 2017),
  https://www.cms.gov/About-CMS/Agency-Information/OMH/Downloads/Issue-
  Briefs-Understanding-Communication-and-Language-Needs-of-Medicare-
  Beneficiaries.pdf ................................................................................................... 15

Cntrs. for Disease Control & Prevention,
  *Coronavirus Disease 2019 (COVID-19), People in Nursing Homes or*

*Long-Term Care Facilities* (updated June 25, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people
-in-nursing-homes.html ........................................................................................... 22

Comment Letter on Proposed Rule on Nondiscrimination in Health and
Health Education Programs or Activities (Box 4.4, 18). ..................................... 6

Comment Letter on Proposed Rule on Nondiscrimination in Health and
Health Education Programs or Activities (Box 4.4, 69) ...................................... 6

Comment Letter on Proposed Rule on Nondiscrimination in Health and
Health Education Programs or Activities (Box 5.1, 389) .................................. 10

Comment Letter on Proposed Rule on Nondiscrimination in Health and
Health Education Programs or Activities (Box 5.1, 571) .................................... 6

Comment Letter on Proposed Rule on Nondiscrimination in Health and
Health Education Programs or Activities (Box 6.2, 23) .................................... 10

Comment Letter on Proposed Rule on Nondiscrimination in Health and
Health Education Programs or Activities (Box 7.3, 131) .................................... 9

Comment Letter on Proposed Rule on Nondiscrimination in Health and
Health Education Programs or Activities (Box 7.3, 366) .................................... 9

Ctrs. for Disease Control & Prevention,
*Demographic Trends of COVID-19 Cases and Deaths in the U.S.
Reported to CDC*,
https://www.cdc.gov/covid-data-tracker/index.html#demographics
(last visited July 13, 2020) ...................................................................... 18, 22

Ctrs. for Medicare and Medicaid Servs.,
*Program of All-Inclusive Care for the Elderly Benefits*,
https://www.medicaid.gov/medicaid/long-term-services-supports/pace/programs-all-
inclusive-care-elderly-benefits/index.htm. (last visited July 13, 2020) ......................... 13

Ctrs. for Medicare and Medicaid Servs.,
*Program of All-Inclusive Care for the Elderly (PACE)*,
https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and
-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office
/PACE/PACE (last updated March 26, 2020, 3:05 PM)................................... 13

Ctrs. for Medicare & Medicaid Servs.,
*Seniors & Medicare and Medicaid Enrollees*
https://www.medicaid.gov/medicaid/eligibility/seniors-medicare-and-medicaid-
enrollees/index.html........................................................................................... 12

Daniel Redman,
> *Fear, Discrimination and Abuse: Transgeinclunder Elders and the Perils of*
> *Long-Term Care*,
> American Society on Aging: AgingToday (March-April 2011),........................................ 8

David F. Warner & Tyson H. Brown,
> *Understanding How Race/Ethnicity and Gender Define Age-Trajectories of*
> *Disability: An Intersectional Approach*,
> 72 Soc. Sci. Med. 1236  (Apr. 2011) ............................................................... 11

David Velasquez et al., *Equitable Access to Health Information for*
> *Non-English Speakers Amidst the Novel Coronavirus Pandemic*,
> Health Affairs (Apr. 2, 2020),
> https://www.healthaffairs.org/do/10.1377/hblog20200331.77927/full/ ........................... 20

Denny Chan & Vanessa Barrington,
> *How Can Legal Services Better Meet the Needs of Low-Income LGBT Seniors?*,
> Justice in Aging 6 (June 2016),
>  https://www.justiceinaging.org/wp-content/uploads/2016/06/How-Can-
> Legal-Services-Better-Meet-the-Needs-of-Low-Income-LGBT-Seniors.pdf ................ 7, 9

Human Rights Watch,
> *"You Don't Want Second Best": Anti-LGBT Discrimination in US Health*
> *Care* (July 23, 2018),
> https://www.hrw.org/report/2018/07/23/you-dont-want-second-best/anti-lgbt-
> discrimination-us-health-care# ........................................................................ 8

Institute of Medicine,
*The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation*
> *for Better Understanding* 252 (2011),
> https://www.ncbi.nlm.nih.gov/books/NBK64806/ ........................................... 8

Jeff Krehely,
> *How to Close the LGBT Health Disparities Gap*,
> Ctr. for American Progress (Dec. 21, 2009),
> https://www.americanprogress.org/issues/lgbtq-rights/reports/2009/12/21/7048/
> how-to-close-the-lgbt-health-disparities-gap/.................................................. 10

Jewish Federation of Cleveland, Comment Letter on Proposed Rule on
> Nondiscrimination in Health and Health Education Programs or
> Activities, (Aug. 12, 2019),
> https://www.regulations.gov/document?D=HHS-OCR-2019-0007-116037........ 14, 15, 17

Justice In Aging,
> *LGBT Older Adults In Long-Term Care Facilities: Stories from the*

*Field*, 11 (updated June 2015),
https://www.justiceinaging.org/wp-content/uploads/2015/06/Stories-
from-the-Field.pdf .................................................................................................. 6

Karen I. Fredriksen-Goldsen,
*Resilience and Disparities among Lesbian, Gay, Bisexual, and Transgender
Older Adults*,
21 Pub. Pol. Aging Rep. 3 (2011) ...................................................................... 8

Kellan Baker & Laura E. Durso,
*Why Repealing the Affordable Care Act is Bad Medicine for LGBT
Communities* (March 22, 2017),
https://www.americanprogress.org/issues/lgbtq-rights/news/2017/03/22/
428970/repealing-affordable-care-act-bad-medicine-lgbt-communities/ ......... 9

Kellan E. Baker et al.,
*The Medicaid Program and LGBT Communities*,
Ctr. for American Progress 4 (Aug. 9, 2016),
https://cdn.americanprogress.org/wp-
content/uploads/2016/08/08125221/2LGBTMedicaidExpansion-brief.pdf .............. 10, 12

Kenneth F. Ferraro et al.,
*Diverse Aging and Health Inequality by Race and Ethnicity*,
1 Innovation in Aging 1 (Mar. 2017),
https://academic.oup.com/innovateage/article/1/1/igx002/3855000 ................................ 11

Kimberlé Crenshaw,
*Demarginalizing the Intersection of Race and Sex: A Black Feminist Critique
of Antidiscrimination Doctrine, Feminist Theory, and Antiracist Politics*,
Univ. Chi. L. Forum 139 (1989). ...................................................................... 11

Lambda Legal,
*When Health Care Isn't Caring: Lambda Legal's Survey of Discrimination
Against LGBT People and People with HIV* 5 (2010),
http://www.lambdalegal.org/sites/default/files/publications/downloads/
whcic-report_when-health-care-isnt-caring.pdf .................................................... 6

MaryBeth Musumeci et al.,
*HHS's Proposed Changes to Non-Discrimination Regulations Under ACA 1557*,
Kaiser Family Found., (July 1, 2019), https://www.kff.org/disparities-policy/
issue-brief/hhss-proposed-changes-to-non-discrimination-regulations-under-
aca-section-1557/ ............................................................................................... 14

Milagos D. Silva et al.,
*Interpreting at the End of Life, A Systematic Review of the Impact of Interpreters
on the Delivery of Palliative Care Services to Cancer Patients with Limited
English Proficiency*,
51 J. of Pain & Symptom Mgmt. 569 (Nov. 5, 2015) ..................................................... 16

NY Times,
*More Than 40% of U.S. Coronavirus Deaths Are Linked to Nursing Homes*,
https://www.nytimes.com/interactive/2020/us/coronavirus-nursing-homes.html
(last updated July 7, 2020) ............................................................................................... 22

Movement Advancement Project (MAP) & Advocacy & Servs. for
LGBT Elders (SAGE),
*Understanding Issues Facing LGBTQ Older Adults* (2017) ..................................... 7, 9, 10

National PACE Association, *PACE by the Numbers*,
https://www.npaonline.org/sites/default/files/3186_pace_infographic_update_
121819_combined_v1.pdf (last visited July 13, 2020) .................................................... 13

Out2Enroll,
*Summary of Findings: 2020 Marketplace Plan Compliance with
Section 1557* (2019),
https://out2enroll.org/out2enroll/wp-content/uploads/2019/11/Report-on-Trans-
Exclusions-in-2020-Marketplace-Plans-2.pdf ................................................................ 13

Sandy E. James, et al.,
*Report of the 2015 National Transgender Survey*,
National Center for Transgender Equality (2016),
https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-
Dec17.pdf (last visited July 13, 2020) .............................................................................. 5

Sarah M. Miner et al.,
*Detecting Disparities in Medication Management Among Limited English
Proficient and English Proficient Home Health Patients*,
32 Home Health Care Mgmt. & Prac. 28 (Feb. 1, 2020). .................................................. 16

Service and Advocacy for GLBT Elders (SAGE) & American Society on Aging,
Comment Letter on Proposed Rule on Nondiscrimination in Health and
Health Education Programs or Activities (Aug. 13, 2019),
https://www.regulations.gov/document?D=HHS-OCR-2019-0007-149028.... 5, 15, 16, 20

Shabab Ahmed Mirza  & Caitlin Rooney,
*Discrimination Prevents LGBTQ People from Accessing Health Care*,
Ctr. for Am. Progress (Jan. 18, 2018, 9:00 AM),
https://www.americanprogress.org/issues/lgbt/news/2018/01/18/445130/
discrimination-prevents-lgbtq-people-accessing-health-care ..................................... 5, 6, 9

Soon Kyu Choi & Ilan H. Meyer, UCLA Sch. L.: The Williams Inst.,
    *LGBT Aging: A Review of Research Findings, Needs, and Policy*
    *Implications* (Aug. 2016),
    https://williamsinstitute.law.ucla.edu/wp-content/uploads/
    LGBT-Aging-Aug-2016.pdf ........................................................................... 10

Tetyana R. Shippee et al.,
    *COVID-19 Pandemic: Exacerbating Racial/Ethnic Disparities in*
    *Long-Term Services and Supports*,
    32 J. of Aging & Soc. Pol'y 321 (2020) ....................................................... 21

U.S. Dep't Health & Human Servs.,
    *Access to Health Services,* Healthy People,
    https://www.healthypeople.gov/2020/topics-objectives/topic/Access-to-Health-
    Services#19 (last visited July 13, 2020) ........................................................ 6

U.S. Dep't Health & Human Servs.,
    *Lesbian, Gay, Bisexual, and Transgender Health*, Healthy People,
    https://www.healthypeople.gov/2020/topics-objectives/topic/lesbian-gay-
    bisexual-and-transgender-health (last visited July 13, 2020) ......................... 4

U.S. Dep't of Health and Human Servs., Office for Civil Rights,
    *OCR Resolves Civil Rights Complaint Against Pennsylvania After it Revises*
    *its Pandemic Health Care Triaging Policies to Protect Against Disability*
    *Discrimination* (April 16, 2020,
    https://www.hhs.gov/about/news/2020/04/16/ocr-resolves-civil-rights
    -complaint-against-pennsylvania-after-it-revises-its-pandemic-health-care.html ............ 23

U.S. Dep't of Health and Human Servs., Office for Civil Rights,
    *OCR Reaches Early Case Resolution with Alabama After It Removes*
    *Discriminatory Ventilator Triaging Guidelines,* (April 8, 2020),
    https://www.hhs.gov/about/news/2020/04/08/ocr-reaches-early-case-
    resolution-alabama-after-it-removes-discriminatory-ventilator-triaging.html ............... 23

U.S. Dep't of Health and Human Servs., Office for Civil Rights,
    *Bulletin: Civil Rights, HIPAA, and the Coronavirus Disease 2019* (Mar. 2020)
    https://www.hhs.gov/sites/default/files/ocr-bulletin-3-28-20.pdf.................................... 23

U.S. Dep't of Health and Human Servs., Office for Civil Rights,
    *Resource for Entities Covered by Section 1557 of the Affordable Care Act*:
    *Estimates of at Least the Top 15 Languages Spoken by Individuals with*
    *Limited English Proficiency for the 50 States, the District of Columbia,*
    *and the U.S. Territories* (2016),
    https://www.hhs.gov/sites/default/files/resources-for-covered-entities-top-15-
    languages-list.pdf ........................................................................................... 19

U.S. Dep't of Health and Human Servs., Office for Civil Rights,
     *Translated Resources for Covered Entities*,
     https://www.hhs.gov/civil-rights/for-individuals/section-1557/translated-
     resources/index.html (last visited July 13, 2020)........................................................... 21

## STATEMENT OF INTEREST

AARP is the nation's largest nonprofit, nonpartisan organization dedicated to empowering Americans 50 and older to choose how they live as they age. With nearly 38 million members and offices in every state, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, AARP works to strengthen communities and advocate for what matters most to families, with a focus on health security, financial stability, and personal fulfillment. AARP's charitable affiliate, AARP Foundation, works to end senior poverty by helping vulnerable older adults build economic opportunity and social connectedness. Approximately 900,000 AARP members self-identify as LGBT,[1] one of the largest constituencies in any U.S. organization with a membership. AARP translates its materials into multiple languages. Among other things, AARP and AARP Foundation fight for access to quality health care across the country and frequently appear as friends of the court on issues affecting older Americans, including challenges to the Patient Protection and Affordable Care Act ("ACA"). *See, e.g.,* Brief for AARP et al. as Amici Curiae Supporting Petitioners, *Texas v. California*, Nos. 19-840 & 19-1019 (U.S. May 13, 2020), 2020 WL 2558283; Brief for AARP et al. as Amici Curiae Supporting Respondents, *NFIB v. Sebelius*, 567 U.S. 519 (2012).[2]

SAGE is the country's oldest and largest organization dedicated to improving the lives of lesbian, gay, bisexual, and transgender ("LGBT") older people. In conjunction with 30 affiliated organizations in 22 states and Puerto Rico, SAGE offers supportive services and resources to

---

[1] As used in this brief, "LGBT" refers to lesbian, gay, bisexual, and transgender; "LGBTQ" refers to lesbian, gay, bisexual, transgender, and queer/questioning.

[2] AARP, AARP Foundation, and SAGE file this amicus brief pursuant to Local Rule of the United States Court for the District of Columbia Civil Rule 7(o). Counsel for amici authored this brief in whole. No party, party's counsel, or any other person other than the amici, its members, or counsel contributed money intended to fund preparing or submitting this brief.

LGBT older people and their caregivers, advocates for public policy changes that address the

needs of LGBT older people, and provides training for organizations that serve LGBT older

people. As part of its mission, SAGE provides services to LGBT older people who face

discrimination when they seek to access to health care. Given its extensive work with LGBT

elders, SAGE is uniquely positioned to address the severe adverse effects that would result if the

Court denies Plaintiffs' motion.

Amici are organizations that represent the interests of older adults. We file this brief

because the Court's decision about the preliminary injunction will dramatically affect whether

LGBTQ older adults and older adults with limited English proficiency have equal access to life-

sustaining health care during the pandemic.

## SUMMARY OF THE ARGUMENT

Section 1557 of the Patient Protection and Affordable Care Act (ACA) is a landmark

civil rights statute that prohibits discrimination on the basis of age, disability, sex, national

origin, race, or color in the provision of health care services. In drafting the law, Congress

recognized the need to ensure all individuals have access to health care services and insurance.

Over the past ten years since it took effect, LGBTQ older adults, older adults with limited

English proficiency (LEP), and others have come to depend upon the law as a powerful tool to

combat discrimination and gain access to quality, affordable care.

In 2016, the Secretary of the Department of Health and Human Services (HHS)

promulgated regulations that reinforced these hard-fought advances.[3] In particular, the 2016 Rule

made clear that for purposes of Section 1557, discrimination "on the basis of sex" includes

---

[3] Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376 (May 18, 2016)
(formerly codified at 45 C.F.R. pt. 92) [hereinafter 2016 Rule].

discrimination based on gender identity and sex stereotypes. The 2016 Rule also ensured meaningful access to health care services for people with LEP by requiring, among other things, that health care providers and other covered entities post nondiscrimination notices and taglines in the top 15 languages spoken throughout the state.

Recently, HHS finalized a new rule that will eviscerate these gains if implemented.[4] The Revised Rule flies in the face of the statutory language of Section 1557 and undermines the discrimination protections central to the law's purpose. The Revised Rule removes discrimination based on gender identity and sex stereotypes from the definition of discrimination based on sex. HHS made these changes despite the Supreme Court's recent ruling making clear that this is a flawed interpretation of what sex discrimination encompasses.[5] The Revised Rule also eliminates key language access requirements. Not only does the Revised Rule condone discriminatory behavior, it forces LGBTQ older adults and older adults with LEP to live in uncertainty and fear when it comes to their ability to access health care.

Eradicating civil rights protections is always unacceptable and dangerous. The consequences of implementing the Revised Rule during a public health crisis are even more dire, and LGBTQ people and those with LEP will be harmed. LGBTQ older adults already face significant health disparities because of a lifetime of overt and systemic discrimination, putting them at greater risk of complications from the virus. Older adults with LEP are also especially vulnerable during this time, and erecting language barriers in their pathway to health care will

---

[4] Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160 (June 19, 2020) (to be codified at 42 C.F.R. pts. 438, 440, 460; 45 C.F.R. pts. 86, 92, 147, 155, 156) [hereinafter Revised Rule].
[5] *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1741 (2020) ("[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex.").

exacerbate their difficulties and jeopardize access to providers. Care denied for a discriminatory purpose, or care delayed out of fear of the same, will cause irreparable harm. Especially during a worldwide pandemic, nothing could be more urgent than ensuring older adults continue to have access to health care services and insurance. Amici respectfully request that the Court grant Plaintiffs' motion.

## ARGUMENT

## I.   The Revised Rule Will Irreparably Harm LGBTQ Older Adults By Deepening the Pervasive Discrimination They Face In Accessing Quality Health Care.

A preliminary injunction or stay of the Revised Rule's implementation date is warranted to halt the proliferation of discrimination against LGBTQ older adults, who have already endured extensive discrimination during their lifetimes. For these individuals, accessing quality health care services and insurance coverage has always been challenging, and these essentials take on increasing importance with age. For LGBTQ older adults, Section 1557 was an important milestone in the fight for equality in accessing vital health care. However, the Revised Rule endorses discrimination, which will only deepen health disparities that LGBTQ older adults feel. As Plaintiffs make clear, loss of access to care causes irreparable harm and warrants immediate relief. Pls.' Mem. at 38 (July 9, 2020), ECF No. 29 (collecting cases).

### A.   Sex Discrimination In Health Care Has A Disproportionate Impact On LGBTQ Older Adults.

Significant health disparities exist between the over 2.7 million older adults who identify as LGBTQ in America and their cisgender, heterosexual peers.  These disparities result from societal stigma, discrimination, and denial of civil and human rights. U.S. Dep't Health & Human Servs., *Lesbian, Gay, Bisexual, and Transgender Health*, Healthy People.  As a result, when compared to older adults in the general population, LGBTQ older adults have worse

4

physical and mental health, higher rates of chronic health conditions, higher rates of disability, and worse outcomes in several areas including high blood pressure, cholesterol, diabetes, heart disease, HIV/AIDs, depression, and more. *See,* Service and Advocacy for GLBT Elders (SAGE) & American Society on Aging, Comment Letter on Proposed Rule on Nondiscrimination in Health and Health Education Programs or Activities (Aug. 13, 2019) [hereinafter SAGE & ASA Comment]. An AARP survey found that many LGBTQ community members have concerns about discrimination in health care as they get older because of their sexual orientation, gender identity, age or ethnicity. Angela Houghton, AARP Research, *Maintaining Dignity: Understanding and Responding to the Challenges Facing Older LGBT Americans: An AARP Survey of LGBT Adults Age 45-plus,* at 42 (March 2018) [hereinafter *Maintaining Dignity*].

These concerns often result in deferral of care. In one survey of lesbian, gay, bisexual, and queer people, 8% of respondents had delayed or foregone medical care because of concerns of discrimination in health care settings. Shabab Ahmed Mirza  & Caitlin Rooney, *Discrimination Prevents LGBTQ People from Accessing Health Care*, Ctr. for Am. Progress (Jan. 18, 2018). In another, 23% of respondents did not seek care they needed because of concern about mistreatment based on their gender identity. Sandy E. James, et al., *Report of the 2015 National Transgender Survey*, National Center for Transgender Equality, at 5 (2016). The Revised Rule invites providers to refuse treatment based on sex stereotypes or gender identity. This would extend to any kind of treatment, be it a common cold, cardiac arrest, broken bone, COVID-19, or gender affirming care. Delay in diagnosis or needed medical care can increase

emotional distress, complications, higher treatment costs, and increased hospitalization. U.S. Dep't Health & Human Servs., *Access to Health Services,* Healthy People.

The available data validates the concerns that LGBTQ elders express. For example, the study *When Health Care Isn't Caring* found that 56% of lesbian, gay, or bisexual people reported experiencing discrimination from health care providers – including refusals of care, harsh language, or even physical abuse – because of their sexual orientation. Lambda Legal, *When Health Care Isn't Caring: Lambda Legal's Survey of Discrimination Against LGBT People and People with HIV* 5 (2010). In a 2017 survey, 8% of lesbian, gay, and bisexual respondents and 29% of transgender respondents reported that a health care provider had refused to see them because of their sexual orientation or gender identity in the past year. Mirza & Rooney, *supra*.

Many LGBTQ older adults who commented on the Revised Rule described discrimination they experienced in health care settings. For example, a 73-year old transgender woman described being treated "with disdain" by her long-time physician and dentist when she came out. Comment Letter on Proposed Rule on Nondiscrimination in Health and Health Education Programs or Activities, Box 5.1, 571. Another commenter, a 56-year old transgender man said, "I have been denied health care; been harassed, insulted, and humiliated when seeking care; and received less than compassionate care — but only when I have 'presented' myself as being transgender." *Id.* at Box 4.4, 18. Another transgender senior described a time his doctor referred him to a new physician for a colonoscopy after he started hormones. *Id.* at Box 4.4, 69. The commenter wrote, "[t]he doctor questioned my use of hormones. He seemed to disagree with my lifestyle." *Id.* Following the colonoscopy procedure, the commenter noticed bruises on his shoulders, torso, and hips. *Id.*

The majority of older LGBTQ adults also fear that if they need long-term services or supports, they will be refused access to in-home assistance, assisted living, and nursing facility care. *See* Maintaining Dignity, at 45-46. As a SAGE report puts it, "[f]or LGBT elders, entering long-term care may be a foreboding concept: to live for the first time in many years among people who may not accept you for who you are or whom you love." Movement Advancement Project (MAP) & Advocacy & Servs. for LGBT Elders (SAGE), *Understanding Issues Facing LGBTQ Older Adults*, 17 (2017) [hereinafter MAP & SAGE]. Being forced back "into the closet" or having to hide one's identity in later life to have access to a suitable place to live where needed health care services are available concerns a third of respondents to an AARP survey. *Maintaining Dignity,* at 18; *see also* Anna Gorman, *LGBTQ Seniors Face Discrimination in Long-Term Care*, Kaiser Health News (Oct. 18, 2016).

Unfortunately, these fears are borne out by facts that show palpable discriminatory barriers to accessing long-term care. Only 20% of LGBTQ seniors in long-term care facilities said they were comfortable being open about their sexual orientation, according to a recent report. Denny Chan & Vanessa Barrington, *How Can Legal Services Better Meet the Needs of Low-Income LGBT Seniors?*, Justice in Aging 6 (June 2016). In another report, nearly half of older LGBT adults reported mistreatment of themselves or a loved one in a care facility. MAP & SAGE, at 17. Many individuals who responded to a different survey reported similar experiences including being "prayed over" by staff, staff refusing to refer to residents by their correct name or pronoun, staff refusing to touch LGBTQ residents, and facilities restricting visitors. Justice In Aging, *LGBT Older Adults In Long-Term Care Facilities: Stories from the Field*, 11, 14-15 (updated June 2015).

These problems are particularly acute for transgender older adults, who fear that staff

may erase their identity by denying them hormone therapy or preventing them from using the

appropriate restrooms. Daniel Redman, *Fear, Discrimination and Abuse: Transgender Elders

and the Perils of Long-Term Care*, American Society on Aging: AgingToday (March-April

2011).  In at least one instance, a California nursing home prevented a transgender resident from

eating or socializing with other residents. *Id.* In another example, multiple nursing facilities

rejected one older adult in Chicago because she is transgender; as a result, doctors refused to

perform necessary emergency brain surgery because she had nowhere to recover. *Id.* If the

Revised Rule is implemented, the discrimination against LGBTQ older adults seeking admission

to and living in nursing facilities is likely to increase.

### B.     Discrimination Against LGBTQ Older Adults Is Compounded By Other Systemic Disadvantages.

Not only do LGBTQ older adults face discrimination, but there is also a dearth of

research on the unique health issues they experience and providers trained to meet their needs.

The number of LGBTQ older adults in the United States is expected to double by 2030,[6] and yet

the Institute of Medicine concluded they are one of the least understood groups in terms of their

health and aging-related needs. Institute of Medicine, *The Health of Lesbian, Gay, Bisexual, and

Transgender People: Building a Foundation for Better Understanding* 252, 259-60, 266-67

(2011). Many LGBTQ people have difficulty finding and accessing providers who offer the

services they need, or who will treat them without passing judgment because of their gender

identity or sexual orientation. Human Rights Watch, *"You Don't Want Second Best": Anti-LGBT

Discrimination in US Health Care* (July 23, 2018). One survey found that only 16% of

---

[6] Karen I. Fredriksen-Goldsen, *Resilience and Disparities among Lesbian, Gay, Bisexual, and Transgender Older Adults*, 21 Pub. Pol. Aging Rep. 3, 4 (2011).

responding hospitals reported having any LGBTQ comprehensive training for providers. Chan & Barrington, *supra* at 4. Respondents to the AARP survey said that the greatest concerns they have are health care providers who are insensitive to their needs, followed by discrimination and prejudice affecting quality of care. *Maintaining Dignity*, *supra* at 13. What's more, LGBTQ people said it would be "very difficult" or "not possible" to find an alternative provider if they were turned away by a hospital, clinic, or pharmacy. Mirza & Rooney, *supra*. One commenter, who described herself as a senior transsexual woman said she had seen "more than my fair share of doctors who don't know how to treat me[,]" and said that "[d]octors & all health care providers need to be required to learn MORE about transgender psychology & transsexual anatomy, instead of being given a pass to ignore trans patients entirely." Comment Letter on Proposed Rule on Nondiscrimination in Health and Health Education Programs or Activities (Box 7.3, 131). Another said, "[w]hile I do not expect all [doctors] to attend to my specific trans-health needs . . . , I do expect that I will be able to go into any urgent care or any emergency room and have my immediate health needs addressed." *Id.*, at Box 7.3, 366. The Revised Rule gives providers permission to refuse to meet that basic expectation.

LGBTQ older adults also face economic barriers to obtaining quality health care. A survey of LGBT adults revealed that they are twice as likely to be uninsured then their non-LGBT counterparts. Kellan Baker & Laura E. Durso, *Why Repealing the Affordable Care Act is Bad Medicine for LGBT Communities* (March 22, 2017). Even if they are able to obtain insurance, it frequently does not cover crucial health services for transgender individuals. MAP & SAGE, *supra* at 16. Despite higher levels of education for older lesbians, gay men, and bisexuals, and the higher likelihood of employment for older lesbians and bisexual women compared to older heterosexual women, this does not result in higher incomes. Fredricksen-

9

Goldsen*, supra* at 4. Indeed, LGBT older adults suffer disproportionate rates of poverty compared to their cisgender, heterosexual peers. Kellan E. Baker et al., *The Medicaid Program and LGBT Communities*, Ctr. for American Progress 4 (Aug. 9, 2016). One transgender senior who commented on the Revised Rule shared that before the ACA she paid for her transition related costs due to insurance exclusions, which hurt her and her family financially. Comment Letter on Proposed Rule on Nondiscrimination in Health and Health Education Programs or Activities (Box 6.2, 23). Another described "constant medical care that I can barely afford." *Id.* at Box 5.1, 389.

In addition, LGBTQ older adults have fewer options for informal care than non-LGBTQ elders. MAP & SAGE, *supra* at 11-12. LGBTQ elders are more likely to live alone, and often lack many of the intergenerational levels of support that heterosexual aging adults typically have. *See* Jeff Krehely, *How to Close the LGBT Health Disparities Gap*, Ctr. for American Progress (Dec. 21, 2009); Soon Kyu Choi & Ilan H. Meyer, UCLA Sch. L.: The Williams Inst., *LGBT Aging: A Review of Research Findings, Needs, and Policy Implications* 8 (Aug. 2016). For that reason, LGBTQ older adults tend to rely more heavily on friends or "families of choice." And while these networks are incredibly strong and resilient, friend networks often age simultaneously, making it difficult for LGBTQ elders to care for one another due to their own physical or mental conditions, or they often lack the legal recognition needed to share health insurance plans and make medical decisions. MAP & SAGE, *supra* at 11-12.

### C.      LGBTQ Older Adults Face Intersectional Discrimination.

LGBTQ older adults also experience discrimination based on multiple factors, including race, disability, and national origin. These types of discrimination cannot be separated. Rather, they intersect and interact to create, sustain, and deepen negative outcomes – going beyond the

sum of each type of discrimination alone. *See* Kimberlé Crenshaw, *Demarginalizing the Intersection of Race and Sex: A Black Feminist Critique of Antidiscrimination Doctrine, Feminist Theory, and Antiracist Politics,* Univ. Chi. L. Forum 139, 139-40 (1989). The results of intersectional discrimination on disparate health outcomes are also well established. *See* David F. Warner & Tyson H. Brown, *Understanding How Race/Ethnicity and Gender Define Age-Trajectories of Disability: An Intersectional Approach*, 72 Soc. Sci. Med. 1236  (Apr. 2011). For example, one study that compared functional limitations across intersections of race and gender found that all demographic groups exhibited worse functional imitation trajectories than white men did, and specifically that Black and Latino women had the highest disability levels. At the intersection of age and race, it is also well researched that Black older adults have shorter life expectancies, live a greater proportion of their lives with a disability, and have higher rates of many leading causes of death, like cancer and heart disease, compared to white older adults. Kenneth F. Ferraro et al., *Diverse Aging and Health Inequality by Race and Ethnicity*, 1 Innovation in Aging 1, 2 (Mar. 2017). LGBTQ older adults of color cannot disentangle their concern about discrimination due to their sexual orientation from their concern about discrimination due to their race or ethnicity. Black and Latinx older adults "carry additional reasons to feel at risk of receiving poor healthcare" because of their race or ethnic identities. *Maintaining Dignity*, *supra* at 43.

In sum, LGBTQ older adults struggle to receive competent, inclusive health care that meets their needs and addresses their lifetime experiences. As described in Plaintiffs' Motion, implementation of the Revised Rule will permit providers to refuse care based on sex stereotypes or gender identity. Pls.' Mem. at 35. Insurance companies will be permitted to deny coverage for medications and procedures solely based on transgender diagnostic profiles or because the

individual's recorded sex in medical or insurance records differs from the sex to which those

health services are ordinarily or exclusively available. 85 Fed. Reg. at 37,181; 37,187-88. These

actions would cause LGBTQ older adults to pay higher out of pocket costs for necessary medical

care, delay treatment, or forego care entirely, thereby deepening the health disparities they face.

The irreparable harm that will result cannot be overstated.

> **D.      LGBTQ Older Adults Also Face Irreparable Harm If The Revised Rule's "Conforming Amendments" Are Implemented.**

In an attempt to achieve what HHS refers to as "greater consistency in civil-rights

enforcement," the Revised Rule will also eliminate ten provisions in CMS regulations containing

express language prohibiting discrimination on the basis of sexual orientation and gender

identity. 85 Fed. Reg. at 37,162. This elimination and the agency's interpretation of what

constitutes sex discrimination under each of these regulations is inconsistent with Section 1557

for the reasons described in Plaintiffs' motion. Pls.' Mem. at 28. Discrimination in these

programs will cause irreparable harm to the LGBTQ older adults who rely on them or wish to

access them.

The Revised Rule attempts to import HHS's incorrect interpretation of sex discrimination

into regulations concerning delivery of Medicaid managed care services. 85 Fed. Reg. at 37,210-

20. Of the nearly 70 million people who receive Medicaid services, (Baker et al., *supra* at 1),

over 7.2 million are low-income seniors. Ctrs. for Medicare & Medicaid Servs., *Seniors &

Medicare and Medicaid Enrollees*. Many of these seniors receive long-term services and

supports through Medicaid managed care organizations (MCOs), entities that contract with state

governments to provide services to Medicaid beneficiaries.

One example of such a managed care program is the Program of All-Inclusive Care for

the Elderly (PACE). 85 Fed. Reg. at 37,243. In states where the program is available, PACE

provides "comprehensive medical and social services to certain frail, elderly people (participants) still living in the community." Ctrs. for Medicare and Medicaid Servs., *Program of All-Inclusive Care for the Elderly (PACE)*. The PACE program is administered by PACE organizations, non-profit private or public entities that provide a variety of benefits to participants, including: adult day care, dentistry, emergency services, home care, hospital care, laboratory/x-ray services, meals, medical specialty services, nursing home care, nutritional counseling, occupational therapy, physical therapy, prescription drugs, primary care (including doctor & nursing services), recreational therapy, social services, social work counseling, and transportation. Ctrs. for Medicare and Medicaid Servs., *Program of All-Inclusive Care for the Elderly Benefits*. The over 51,000 older adults who participate in the PACE program, (National PACE Association, *PACE by the Numbers*, (last visited July 13, 2020)), and LGBTQ older adults who wish to access PACE services, may face institutionalization and thus irreparable harm if they are discriminated against. *See Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1161, 1176 (N.D. Cal. 2009).

The Revised Rule also seeks to eliminate anti-discrimination protections from regulations that concern several aspects of administration of the ACA, including the general standards for the exchanges, guaranteed coverage, and issuers of qualified health plans. 85 Fed. Reg. at 37,220-21. These rules ensure all individuals have equal access to health insurance. Prior to the ACA, insurance companies could deny LGBTQ individuals insurance coverage or charge higher rates simply based on their sexual orientation or gender identity. But now, several years after implementation of the ACA, including Section 1557's provisions prohibiting sex discrimination, research shows that 97% of insurers did not include transgender-specific exclusions in their 2020 silver marketplace plans. Out2Enroll, *Summary of Findings: 2020*

*Marketplace Plan Compliance with Section 1557*, 1 (2019). This is significant progress, but it is meaningless if exchanges and issuers can engage in discrimination and prevent transgender individuals from obtaining these plans, including older transgender adults.

## II.    The Revised Rule Harms Older Adults With Limited English Proficiency By Rolling Back Language Access Protections and Blunting Their Access To Care.

The Revised Rule harms millions of older adults with limited English proficiency (LEP) by weakening language access protections. These protections are vital for these older adults because their inability to communicate with their health care providers to understand their diagnosis, treatment options, proper use of medication, side effects, informed consent, and insurance coverage can and do result in adverse health consequences and increased costs. MaryBeth Musumeci et al., *HHS's Proposed Changes to Non-Discrimination Regulations Under ACA 1557*, Kaiser Family Found., (July 1, 2019); *see also* Jewish Federation of Cleveland, Comment Letter on Proposed Rule on Nondiscrimination in Health and Health Education Programs or Activities, 4 (Aug. 12, 2019). For older adults with LEP, adequate language access services are not merely a kindness. They can be a matter of life or death.

Recognizing that language barriers can prevent access to care, Section 1557 protects people with LEP from language discrimination in health care. 42 U.S.C. § 18116 (2010). Consistent with Title VI and other civil rights laws, Section 1557's protections require covered providers to take reasonable steps to provide meaningful access to each person with LEP they serve or encounter within their health programs and activities. *See Lau v. Nichols*, 414 U.S. 563 (1974). In line with that, the 2016 Rule codified Section 1557's objectives and long-standing guidance about meaningful access for people with LEP, including providing free, accurate, and timely language assistance services including interpreters.

The Revised Rule reverses these gains by immediately cutting back the language access protections. In doing so, the rule places older adults with LEP at risk of being unable to access life-saving care during the pandemic. This risk amounts to irreparable harm warranting a preliminary injunction.

### A.   Without Adequate Antidiscrimination Protections, Millions of Older Adults With LEP Will Not Have Meaningful Access To Health Care.

The Revised Rule would have a nationwide impact on millions of older adults with LEP who need access to care. In the United States, over 25 million people are LEP, including about 5 million older adults. SAGE & ASA Comment at 3. These older adults live throughout the country. For example, 4 million Medicare beneficiaries are LEP. CMS Office of Minority Health, *Understanding Communication and Language Needs of Medicare Beneficiaries*, 8 (Apr. 2017). More than 80% of Medicare beneficiaries are over 65. Center for Medicare Advocacy, *Quick Medicare Facts & Statistics*, (Feb. 9, 2011). Of these beneficiaries, twenty-two percent live in California, 19% in Hawaii, 16% in New York, 13% in Texas, 12% in New Jersey, 12% in Florida, and so on. *Id.* at 11.

In addition, while most older adults with LEP speak Spanish, the others speak several different languages. *Id.* at 9. According to reports from the CMS's Office of Minority Health, over 200,000 Medicare beneficiaries speak Chinese, over 150,000 speak Vietnamese, over 140,000 speak Tagalog, and over 100,000 speak Italian. *Id.* Other groups of older adults with LEP include 80,000 Holocaust survivors and 500,000 Russian-speaking Jewish immigrants. Jewish Federation of Cleveland, *supra* at 3.

On top of being LEP, many older adults are from racial or ethnic communities that have a history of health and economic disparities. Ariel Yeheskel et al., *Exploring the 'Patient Experience' of Individuals with Limited English Proficiency: A Scoping Review,* 21 J. of

Immigrant & Minority Health 853, 863 (Sept. 10, 2018). While resilient, they face challenges on many fronts. Some older adults with LEP experience overt linguist discrimination by health care professionals and administrative staff.[7] Others are ridiculed for their different cultural mannerisms, behaviors, or dress. *Id.* at 874.

Language assistance is necessary for older adults with LEP to access health care and understand their rights and complications of any illnesses. Studies have shown that language barriers prevent people with LEP from obtaining life-saving health care services and insurance. *Id.*; *see also* City of New York, Comment Letter on Proposed Rule on Nondiscrimination in Health and Health Education Programs or Activities (Aug. 13, 2019). They also compromise the quality of care adults with LEP receive and increase the risk of adverse health outcomes. *Id.* Without adequate language assistance, older adults with LEP have trouble understanding their diagnosis and treatment, and providers have trouble understanding their concerns. SAGE & ASA Comment at 3. For example, a study examining people receiving palliative care for cancer found that without professional interpreter services, they did not properly understand their diagnoses and prognoses, experienced more pain and anxiety, and worse quality of care. Milagos D. Silva et al., *Interpreting at the End of Life, A Systematic Review of the Impact of Interpreters on the Delivery of Palliative Care Services to Cancer Patients with Limited English Proficiency*, 51 J. of Pain & Symptom Mgmt. 569 (Nov. 5, 2015).

Language barriers also cause other treatment obstacles. Older adults with LEP can have problems taking their medications properly, placing them at risk of adverse reactions. Sarah M. Miner et al., *Detecting Disparities in Medication Management Among Limited English Proficient and English Proficient Home Health Patients*, 32 Home Health Care Mgmt. & Prac. 28 (Feb. 1,

---

[7] *Id.* at 874.

2020). They may have problems assessing their treatment options, asking questions, or providing truly informed consent. Older adults with LEP who feel comfortable speaking English in their daily lives may find it difficult when talking about health care terminology in a non-native language. Jewish Federation of Cleveland, *supra* at 3. This is particularly true in emergencies. When providers deny older adults with LEP adequate language services, they are less likely to seek preventive care or return for follow-up visits.

Language barriers also impair older adults with LEP's ability to access insurance. They can have trouble understanding the coverage and benefits. For instance, Asian American and Native Hawaiian Pacific Islander community-based organizations reported cases in which people did not know their rights, and did not realize their providers had sent legal notices because the notices were not in their language. Asian Health Services, Comment Letter on Proposed Rule on Nondiscrimination in Health and Health Education Programs or Activities (Aug. 13, 2019); California Pan-Ethic Health Network, Comment Letter on Proposed Rule on Nondiscrimination in Health and Health Education Programs or Activities (Aug. 13, 2019). If they are not informed of their rights, people with LEP might not appeal a wrongful denial of coverage or follow-up on necessary care. *Id.* Older adults with LEP often lack awareness about their rights which can impact their ability to complain about poor care.

Finally, without adequate language access services, an older adult with LEP may have to rely on their own limited use of English, unqualified staff, or a family member as an interpreter. Comment of City of New York, *supra* at 21. In those instances, the risk of miscommunication is high. This is dangerous for both the person with LEP and the provider. When patients do not know they have the right to an interpreter, do not know how to request an interpreter, cannot read important notices about their care or insurance, or cannot communicate about their symptoms, it

is much more likely that they will not receive care or services they need. *Id.* Moreover, if the provider cannot communicate properly with the patient to elicit proper diagnostic information, the patients' health is at risk. Without adequate language access services, older adults with LEP cannot communicate about their health care needs and treatment issues, placing their health and well-being at risk of irreparable harm.

> **B.     The Revised Rule Undermines Section 1557's Protections For Older Adults With LEP And Threatens Their Ability To Meaningfully Access Care During The Pandemic.**

The ACA's Section 1557 and the 2016 Rule provide language access protections that ensure older adults with LEP receive health care information in a language they can understand. The Revised Rule will immediately roll back these protections, thereby hurting their ability to meaningfully access health care. Losing these protections is harmful at any time, but particularly now when the country faces a pandemic where older adults make up 94% of the deaths. Ctrs. for Disease Control & Prevention, *Demographic Trends of COVID-19 Cases and Deaths in the U.S. Reported to CDC*.

HHS itself recognized these dangers for people with LEP. It acknowledged the "potential of reduced awareness of the availability of language services by LEP individuals by the changes made in this rule, or downstream effects on malpractice claims due to less awareness." 85 Fed. Reg. at 37,235. Even so, it finalized the Revised Rule. As Plaintiffs have shown, this Revised Rule violates the APA and flouts Section 1557's mandate.

In contrast, the 2016 Rule promotes the law's objectives and should be left in place. It provides a comprehensive set of protections for people with LEP to ensure they have meaningful access to care. 45 C.F.R. § 92. Among other things, the 2016 Rule requires:

18

A. <u>Notice</u>: Covered providers must post a notice to notify beneficiaries, enrollees, applicants, or members of the public of individuals' rights under Section 1557 and the providers' nondiscrimination obligations for their health programs and activities. *Id.* This notice must include: (1) a statement that the provider does not discriminate on bases that Section 1557 prohibits; (2) a statement that language assistance and appropriate aids and services (such as interpreters) are available timely and without charge; (3) how to obtain these aids and services; and (4) instructions on how to file a complaint with the HHS Office for Civil Rights (OCR). *Id.*

B. <u>Taglines</u>: Taglines are short statements describing the provider's ability to provide free language assistance services (e.g., "ATTENTION: If you speak [insert language], language assistance services, free of charge, are available to you. Call 1-xxx-xxx-xxxx, or TTY: 1-xxx-xxx-xxxx.). The 2016 Rule requires providers to post taglines in a minimum of 15 non-English languages most prevalent within the state. *Id.* To assist providers, OCR provided a list of the top 15 non-English languages per state. U.S. Dep't of Health and Human Servs., Office for Civil Rights, *Resource for Entities Covered by Section 1557 of the Affordable Care Act*: *Estimates of at Least the Top 15 Languages Spoken by Individuals with Limited English Proficiency for the 50 States, the District of Columbia, and the U.S. Territories* (2016). It also published a notice of nondiscrimination, statement of nondiscrimination, and taglines translated into 64 different languages. U.S. Dep't of Health and Human Servs., Office for Civil Rights, *Translated Resources for Covered Entities*.

C. <u>Language Access Plans</u>: When the Director of OCR is evaluating a provider's compliance with Section 1557, the 2016 Rule requires them to consider and give substantial weight to the nature and importance of the health program or activity and the communication at issue to the person with LEP. 45 C.F.R. § 92.201(b)(1). It also requires the Director to consider other factors, including whether the provider has developed and implemented an effective written language access plan. *Id.* at (b)(2)

In effect, the 2016 Rule prevents discrimination in health care and promotes meaningful access by, among other things, ensuring that providers notify people of their rights to free language services in a language that they can understand and how to file a claim if they experience discrimination. People with LEP can then assert their health care rights and gain meaningful access to care, complete with informed communication about their medical condition.

The Revised Rule immediately cuts back these protections and contravenes the ACA's nondiscrimination objectives. For example, the Revised Rule strips notice and tagline requirements. Without these requirements, people with LEP may never learn that language services and auxiliary aids and services are free and available, or how to request them. Comment of Asian Health Services, *supra*. They may never learn of the specific antidiscrimination protections Section 1557 provides in the healthcare context, including their rights to file a complaint, and how to file it. *Id.*

The rule also strikes references to language access plans, removing a key tool that supports compliance efforts with Section 1557's mandate. Without consideration of these plans as part of a compliance review, providers may fail to fully plan on how to best meet the needs of their patients with LEP. SAGE & ASA Comment at 8; Comment of Asian Health Services, *supra*. All in all, the Revised Rule will obstruct older adults with LEP from accessing appropriate medical care. It will make it harder for them to describe their condition to providers, gather information about needed treatments, and advocate for themselves. This places them at risk of inappropriate care, adverse events, and all other negative outcomes of language barriers.

Older adults with LEP cannot afford these losses during a pandemic. They are already at disadvantage because general news about COVID-19 may not be available in their language. David Velasquez et al., *Equitable Access to Health Information for Non-English Speakers Amidst the Novel Coronavirus Pandemic*, Health Affairs (Apr. 2, 2020). In addition, many live in impoverished communities that the pandemic has hit hard because of close living conditions, overcrowding, and badly developed infrastructure. *Id.* Many also work in front-facing jobs. All of this leaves them in a situation of being at higher risk of contracting the virus, while simultaneously losing their ability to meaningfully access needed health care.

Those who reside in nursing facilities are in an even more dangerous situation. Tetyana R. Shippee et al., *COVID-19 Pandemic: Exacerbating Racial/Ethnic Disparities in Long-Term Services and Supports*, 32 J. of Aging & Soc. Pol'y 321, 326 (2020). Being in a nursing facility is already socially isolating. Now the crisis has left them with limited or no access to family, friends, and the Long-Term Care Ombudsman. In addition, those who live in institutional settings are at higher risk of contracting COVID-19. Cntrs. for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19), People in Nursing Homes or Long-Term Care Facilities* (updated June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-in-nursing-homes.html. During this time of great uncertainty and increased isolation, older adults with LEP should not also face diminished language access services. Plaintiffs' motion should be granted to avoid this harm.

III.   **Enjoining Implementation of the Revised Rule Is In The Public Interest Because An Injunction Will Stop Millions of Older Adults From Losing Life-Saving Antidiscrimination Health Care Protections In the Midst Of The Pandemic.**

As Plaintiffs' demonstrate, the balance of equities and public interest sharply favor a preliminary injunction. Pls.' Mem. at 42-44. HHS's only harm is that it will have to keep in place the existing regulations that have already been in place for 4 years, while this case proceeds. *District of Columbia v. U.S. Dep't of Agric.*, No. 20-cv-119, 2020 WL 1236657 (D.D.C. Mar. 13, 2020). That hardship pales in comparison to the irreparable injuries that Plaintiffs assert. It also pales in comparison to the harm millions of older adults will face if the Revised Rule is implemented. *See Trump v. Int'l Refugee Assistance Project*, 137 S.Ct. 2080, 2087 (2017) ("In awarding a preliminary injunction, a court must consider[] . . . the overall public interest." (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008))).

Allowing the Revised Rule to go forward during a once-in-a-century pandemic will wreak havoc on the lives of the most vulnerable older adults while they bear the brunt of the

virus and clamor for care. Ninety-four percent of pandemic deaths have been people over 50.

Ctrs. for Disease Control & Prevention, *Demographic Trends of COVID-19 Cases and Deaths in the U.S. Reported to CDC*. Forty-two percent have been residents of nursing facilities. NY Times, *More Than 40% of U.S. Coronavirus Deaths Are Linked to Nursing Homes*. There could not be a worse time for older adults to face changes in their health care, let alone anything that stands in their way of equal access to life-saving care. Without an injunction, LGBTQ older adults would return to the days when health care discrimination was pervasive: when physicians, hospitals, pharmacies, and nursing facilities might turn them away at the door, when staff engage in demeaning behavior or outright abuse, and insurance did not cover necessary medical procedures. The harm that discrimination in health care causes is impossible to reverse.

Likewise, older adults with LEP would also be at risk of harm. Language barriers hamper meaningful access to care and hurt the quality of care. Older adults with LEP seeking care during the pandemic will not know that free, timely, language access services are available because they will not be provided notices with taglines in their language. They will have trouble understanding their diagnosis and treatment recommendations, and communicating about their symptoms with providers.

Not only is this result not in the public interest, but it contradicts Section 1557's mandate to combat discrimination to remove barriers to care. As this public health crisis rages on, vulnerable older adults need the law's nondiscrimination protections to ensure they have equal access to care. Indeed, these protections have already been key to prohibiting discrimination in health care during the pandemic as states and providers developed crisis care rationing standards and plans. OCR responded by issuing guidance to covered entities on compliance with Section 1557. U.S. Dep't of Health and Human Servs., Office for Civil Rights, *Bulletin: Civil Rights,*

*HIPAA, and the Coronavirus Disease 2019* (March 28, 2020). Recently, OCR resolved complaints filed under Section 1557 and other civil rights laws against Alabama and Pennsylvania for their discriminatory crisis rationing standards and guidelines, compelling the states to revise those standards.[8]

As resources like Intensive Care Unit beds become scarce, providers and states may again start to ration or decide who deserves health care services and equipment. Vulnerable older adults need the full force of the 1557 protections to ensure they have equal access to these items. Given the circumstances, the equities favor an injunction to preserve the status quo.

Section 1557 is a landmark law that provides much-needed antidiscrimination protections to millions of older adults who could not access health care because of systemic and pervasive discrimination. The Revised Rule flouts the law and ends a decade of progress gained by vulnerable older adults who have been resilient in the face of hardships. Granting the injunction will help ensure that they can access health care while this public health crisis continues.

## CONCLUSION

For these reasons, the motion for preliminary injunction or for a stay should be granted.

---

[8] U.S. Dep't of Health and Human Servs., Office for Civil Rights, *OCR Reaches Early Case Resolution with Alabama After It Removes Discriminatory Ventilator Triaging Guidelines,* (April 8, 2020), https://www.hhs.gov/about/news/2020/04/08/ocr-reaches-early-case-resolution-alabama-after-it-removes-discriminatory-ventilator-triaging.html\; U.S. Dep't of Health and Human Servs., Office of Civil Rights, *OCR Resolves Civil Rights Complaint Against Pennsylvania After it Revises its Pandemic Health Care Triaging Policies to Protect Against Disability Discrimination* (April 16, 2020, https://www.hhs.gov/about/news/2020/04/16/ocr-resolves-civil-rights-complaint-against-pennsylvania-after-it-revises-its-pandemic-health-care.html.

Dated: July 15, 2020                          Respectfully Submitted,

                                              */s/ Kelly Bagby*
                                              Kelly Bagby (D.C. Bar # 462390)*
                                              Meryl Grenadier (D.C. Bar # 1024111)
                                              Maame Gyamfi (D.C. Bar # 462842)
                                              AARP Foundation Litigation
                                              601 E Street NW
                                              Washington, DC 20049
                                              T: (202) 434-2060
                                              kbagby@aarp.org
                                              mgrenadier@aarp.org
                                              mgyamfi@aarp.org
                                              *Counsel of Record*

                                              *Counsel for Amici Curiae*

24

**CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2020, I electronically filed the foregoing Motion of Brief of Amici Curiae AARP, AARP Foundation, and SAGE in Support of Plaintiffs' Motion for Preliminary Injunction with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Date: July 15, 2020                  */s/ Kelly Bagby*
                                     Kelly Bagby